## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SARAH GRASSO,**<br>    **4111 South Four Mile Run Drive**<br>    **Unit 202**<br>    **Arlington, Virginia 22204 ,**<br><br>        **Plaintiff,**<br><br>        **v.**<br><br>**COASTAL INTERNATIONAL**<br>    **SECURITY, INC.,**<br>    **6101 Fallard Drive**<br>    **Upper Marlboro, MD 20772,**<br><br>        **Defendant.** | **Civil Action No. _____** |

## COMPLAINT
(Personal Injury and Violation of Federal Law)

### Introduction

1.    Plaintiff Sarah Grasso brings this action against defendant Coastal Security, Inc. to redress unlawful and tortious acts of assault, battery, and intentional infliction of emotional distress, as well as violations of the Rehabilitation Act of 1973, and the Americans with Disabilities Act of 1990, committed against her by defendant's employees and agents, for whose actions defendant is liable.

### Jurisdiction

2.    This Court has jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. § 1332, as the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different States.  In addition, this Court has subject matter jurisdiction over this civil action  pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, thereby presenting a federal question.

## Venue

3.      Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b), as the events giving rise to plaintiff's claims occurred in this judicial district, and the defendant is located, has offices, and conducts business in this judicial district.

## Parties

4.      Plaintiff Sarah Grasso is a citizen of the United States and a resident of the Commonwealth of Virginia.

5.      Defendant Coastal International Security, Inc. is a government contracting company, with its principle place of business in the State of Maryland, which does business in the District of Columbia.

## Statement of Facts

6.      Sarah Grasso is an American Sign Language Interpreter, who often provides interpreter services as a contractor at agencies of the federal government in the Washington, D.C., area.  On Tuesday, October 17, 2017, Ms. Grasso went to the headquarters of the U.S. Government Accountability Office (GAO), located at 441 G Street, N.W., Washington, DC 20226, which is a federal facility.  At the time, Ms. Grasso had a contract to perform interpreter duties on a weekly basis at GAO headquarters, and she had been doing so under this contract since August 2017.

7.      Ms. Grasso is diagnosed with post-traumatic stress disorder (PTSD), which entails susceptibility to anxiety and panic attacks.  PTSD is a disability under the Americans with Disabilities Act (ADA) as it substantially limits one or more of Ms. Grasso's major life activities. *See* 42 U.S.C. § 12102 (1) ("the term 'disability' means, with respect to an individual (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment").

-2-

8.      Due to her PTSD disability, Ms. Grasso is regularly accompanied by her service animal, a dog who is fully trained and certified to perform specific tasks to mitigate the adverse effects of Ms. Grasso's disability.  Ms. Grasso's service dog is specifically trained to operate off-leash.

9.      Ms. Grasso was accompanied by her service dog when reporting for her assignment at GAO headquarters on October 17, 2017, just as she had been on numerous prior occasions when she went to GAO headquarters.  The service dog was wearing a vest which clearly identified him as a service animal.

10.      On October 17, 2017, the GAO entrance was manned by security personnel employed by defendant, Coastal International Security, Inc. (CIS).  CIS provides security personnel pursuant to a contract(s) with the federal government.  On this unfortunate occasion, rather than seeing Ms. Grasso into the building in a professional manner, CIS security personnel subjected her to assault, battery, and infliction of emotional distress, and violated federal law in the process.

11.      Ms. Grasso accessed  the GAO building through the G Street, N.W. entrance.  She walked through the first set of doors with her service dog walking alongside her and under her full control by use of verbal and hand commands.

12.      As soon as Ms. Grasso approached the second set of doors, one Officer Alexander of CIS, who was behind the security desk, made eye contact with Ms. Grasso and began to advance toward her.  Once Ms. Grasso entered the lobby area, prior to her walking up the steps leading to the security desk, this Officer Alexander told her she needed to maintain control of her animal.  Despite the fact that Ms. Grasso's dog had been in her full control, and behaving impeccably the entire time she was within the GAO building, as she walked up the steps Officer Alexander started repeating incessantly – and incorrectly – that Ms. Grasso did not have control of her animal, and ordering her to gain such control.  To be clear, from the moment Ms. Grasso entered the building until the

moment she arrived at the security desk, her service dog had not left her side nor misbehaved in any manner.

13.     When Ms. Grasso reached the security desk, she gave her service dog the command to sit while she provided her credentials. Inexplicably, Officer Alexander continued to berate Ms. Grasso, ordering her to "gain control" of her service dog, although the service dog had been totally under Ms. Grasso's control, and had been well behaved, the entire time. In response, Ms. Grasso advised Officer Alexander that she did have full control of her service dog.

14.     Officer Alexander then threatened Ms. Grasso, stating there was a policy in place requiring her to comply with his orders, although Ms. Grasso had not violated any orders or policies whatsoever, but was simply trying to enter the GAO building with her well-behaved service dog in an orderly fashion as she had done on numerous previous occasions.

15.     Ms. Grasso then respectfully asked Officer Alexander to show her a written copy of the policy to which he was referring. At this request, Officer Alexander became visibly agitated, accused Ms. Grasso of being "difficult" and needlessly escalated the situation. Also, it was at this point that Officer Alexander came up with the notion that Ms. Grasso's service dog was required to be on a leash, which Ms. Grasso later learned was an entirely bogus statement of a non-existent policy. Officer Alexander said that since Ms. Grasso was not physically holding the dog on a leash, it was impossible for her to have control. In response to this accusation, Ms. Grasso patiently informed Officer Alexander that her service dog is specifically trained to function off-leash. In addition, Ms. Grasso uses a device with components attached to the service dog and to herself which enables her to maintain control.

16.     Officer Alexander then ordered Ms. Grasso to have her service dog perform a task to prove to him that he was truly a service animal. Of course, such a request is impermissible under the ADA

according to guidance provided by the Department of Justice's Office of Civil Rights.[1]  Accordingly,

Ms. Grasso declined to distract her service dog from the tasks at hand in order to perform tricks for

Officer Alexander.

17.     While all of this was occurring, Ms. Grasso's credentials were run, and she was provided a

green visitor's badge, indicating that she had been pre-screened and placed on the visitor access list.

At this point in time, Officer Alexander was on the phone with his supervisor, falsely alleging that

Ms. Grasso was creating a difficult situation and not following security protocols, thereby increasing

the stress of the situation on Ms. Grasso even further.  Thereafter, Officer Alexander stated that he

confirmed that there was a policy requiring Ms. Grasso's service dog to be tethered to her, though

again Ms. Grasso later learned that no such formal policy exists.

18.     Officer Alexander persisted in berating Ms. Grasso with unnecessary and harassing

questions and accusations about her service dog.  During this questioning, Ms. Grasso felt the onset

of panic attack symptoms.  Having frequented this GAO building many times before, Officer

Alexander's aggressive behavior, as well as the change of routine he was creating, were direct causes

of this panic attack.  Ms. Grasso began to feel physically ill –  indicating the onset of a

disability-related episode –  and knew she needed to sit down with her service dog nearby so he

could assist her by mitigating her symptoms.

---

[1]This guidance may be viewed at: https://www.ada.gov/service_animals_2010.htm:
"When it is not obvious what service an animal provides, only limited inquiries are allowed.
Staff may ask two questions:  (1) is the dog a service dog required because of a disability, and
(2) what work or task has the dog been trained to perform.  Staff cannot ask about the person's
disability, require medical documentation, require a special identification card or training
documentation for the dog, or ask that the dog demonstrate its ability to perform the work or
task." (Emphasis added.)

19.     Accordingly, Ms. Grasso approached an Officer Hotte (also a CIS employee) near the metal detector and informed him she was ill and needed to sit down on a couch just beyond the detector – the only seating which appeared available in the building's lobby area.  Instead of accommodating Ms. Grasso, Officer Hotte yelled at her that she did not have permission to sit in this area and ordered her to leave.  This treatment served to exacerbate Ms. Grasso's symptoms –  her vision became impaired, her legs became numb, and she had difficulty comprehending what was happening and why.

20.     At this point, Ms. Grasso telephoned her colleague, Jordan Stokes for guidance, as he is knowledgeable of the Federal Protective Service rules.  Mr. Stokes had been previously briefed on coping techniques and skills to help safely guide Ms. Grasso through a traumatic experience.  Over the telephone, Ms. Grasso summarized what was happening, including that she was being harassed by the security officers and, as a result, was suffering a panic attack which symptoms included not being able to see and numbness in her legs.  Mr. Stokes eventually spoke with a Lieutenant Burkholder, a CIS supervisory employee at the GAO building, who asserted that Ms. Grasso needed to be physically tethered to the animal, and that CIS personnel were currently seeking a cord to use for this purpose.

21.     The CIS officers had aggressively and needlessly berated Ms. Grasso, and had forcibly separated her from her service dog, whose express purpose is to mitigate PTSD and its anxiety symptoms.  As a result of the CIS officers' actions, at this point Ms. Grasso went into a full-blown panic attack, experiencing an episode of extreme fear and anxiety.  Symptoms of such an attack include the loss of sight, uncontrollable tremors, the inability to breathe effectively, and the inability to process auditory or visual information being directed at her – all of which Ms. Grasso experienced during this attack.

22.     Ms. Grasso's service dog is trained to apply pressure to her body and otherwise engage with her in order to minimize the severity and duration of these attacks.   However, any movement by others toward Ms. Grasso herself and her service dog distracts the animal.  Moreover, Ms. Grasso's service dog is specifically trained not to interfere when law enforcement (or people who look like law enforcement, such as security guards) approach Ms. Grasso as such persons may be there to render aid.  As the CIS officers at GAO that day had separated Ms. Grasso from her service dog, then approached her, kept an unnecessarily close proximity to her, and touched her without her consent – actions to which she objected – as she was experiencing a severe panic attack, Ms. Grasso's service dog, per his training, was not able to come to her aid.  Thus, the CIS officers' actions not only cause the onset of Ms. Grasso's panic attack, but exacerbated and prolonged this harrowing experience for her.

23.     As more CIS officers approached Ms. Grasso and touched her over her objections, she continued to request that they back away and not touch her.  However, Lt. Burkholder proceeded to pet and touch her service dog, further disrupting the animal's ability to perform his tasks and creating enormous stress on him and Ms. Grasso.  It is fairly common knowledge that strangers are not to pet or distract a service dog as it prevents him from performing his duties.  Yet, this is just what Lt. Burkholder did, further worsening the situation for Ms. Grasso.

24.     Instead of allowing Ms. Grasso's service dog to do his job, the CIS officers barked contradictory orders at her, telling her to calm down, relax, stop, leave, move, all of which were impossible while she was under duress and unable to access the aid of her service dog.  At no time did any CIS officer offer Ms. Grasso medical assistance, whether from EMS or onsite medical staff.

25.     About 40 minutes after this incident began, a deaf GAO staff member named Tara Congdon came by the building lobby and, seeing the commotion, came to Ms. Grasso's assistance.  A female

CIS security officer (name unknown) advised Ms. Congdon that Ms. Grasso would be free to enter the facility with an escort once she went through the metal detector. This female officer also whispered to Ms. Grasso that the supposed policy that the service dog be tethered to Ms. Grasso's person would not be enforced.

26. Ms. Grasso was finally permitted to go through the metal detector while her service dog waited on the other side for her, and she and her dog proceeded into the building with an escort. However, due to the trauma the CIS officers had caused her, Ms. Grasso was unable to begin working for approximately another three hours. Once Ms. Grasso was able to provide interpreting services, the trauma the CIS officers caused her interfered with her work, and as a result, Ms. Grasso had to leave the facility approximately an hour earlier than scheduled.

27. Later in the day, after Ms. Grasso had somewhat semi-recovered from this incident, she spoke with Second Lieutenant Burkholder in an effort to obtain the names of the officers involved. Second Lieutenant Burkholder informed Ms. Grasso that, contrary to what Officer Alexander had insisted, there in fact was no written policy requiring a leash or tether on Ms. Grasso's service dog. Rather, the policy simply states that Ms. Grasso was required to maintain control of her service dog. Second Lieutenant Burkholder confirmed to Ms. Grasso that, based on his observations, Ms. Grasso did indeed appear to have control of her service dog.

28. The actions of the CIS employees caused Ms. Grasso extreme and lasting emotional distress and disturbance. Their actions impeded her ability to do her job, and caused her personal and professional embarrassment. Ms. Grasso is now fearful while in the GAO building. She is afraid to leave and give her service dog an opportunity to relieve himself because she may be harassed over him during re-entry and forced into another episode. This experience has left Ms. Grasso feeling utterly unsafe while at GAO and, indeed, when entering any government facility that requires

security screening, which includes virtually all government facilities. Indeed, on November 21, 2017, Ms. Grasso was harassed because of her service dog by another government contractor – this time a bus operator – while attempting to obtain a badge to enter a USAID facility. Having been left in a hypersensitive state by the actions of the CIS officers at GAO a month earlier, this November episode caused Ms. Grasso to suffer another full-blown panic attack, necessitating EMS attention for over an hour.

29.     Ms. Grasso brought her complaints against CIS regarding its employees' appalling and discriminatory conduct to the company's attention. Despite being placed on notice, CIS employees subjected Ms. Grasso to yet another traumatizing ordeal.

30.     On or around April 11, 2018, at approximately 1:20 p.m., Ms. Grasso entered the Ronald Reagan Building (RRB) located at 14th Street, N.W. and 1300 Pennsylvania Avenue, N.W. for the purpose of providing ASL interpreter services. Ms. Grasso was entering the section of the building which houses the U.S. Agency for International Development (USAID) on 14th Street, N.W. Ms. Grasso had been frequenting this facility approximately twice per week starting in January 2018, always accompanied by her service animal, previously without incident. On this occasion, Ms. Grasso utilized a leash with her service animal as she entered the building.

31.     CIS security officers were manning the USAID entrance. Unfortunately on this occasion, approximately four to five CIS security employees subjected Ms. Grasso to strikingly similar acts of harassment, intimidation, and discrimination as she had been subjected to on October 17, 2017 at the GAO building by other CIS security personnel.

32.     Ms. Grasso had been providing ASL interpreter services for a USAID employee and stepped out for lunch. Ms. Grasso returned at approximately 1:20 p.m., and walked into the building holding a leash for her service dog. While grasping her contractor badge, Ms. Grasso dropped the leash. She

retrieved it, then placed her badge on the key pad to open the gates. The leash dropped from Ms. Grasso's hand again as she did this. Ms. Grasso's service dog remained impeccably well-behaved throughout.

33.     At this point, a CIS security officer began to berate Ms. Grasso, telling her that she needed to hold the leash at all times. As explained previously, there is no such policy in place. Ms. Grasso explained this to the CIS security officer, as well as that she was entitled to the assistance of her service animal due to her disability, but to no avail.

34.     Ms. Grasso informed the CIS security officers present more than three times that she was following the set standards pertaining to service animals, and that she had been there that morning with no issues. By this point, approximately five CIS officers were involved, and Ms. Grasso had informed them all that her conduct was in compliance with applicable policies, and that she was entitled to enter the building with her service animal. Ms. Grasso also requested to consult a CIS supervisor.

35.     Nonetheless, the CIS security officers did not back down and continued to prevent Ms. Grasso from entering the building. After having to speak to the fifth CIS security officer, a panic attack began to ensue for Ms. Grasso.

36.     A CIS supervisor finally did arrive on the scene.  It was quite obvious to any observer that Ms. Grasso was beginning to experience a panic attack, due to her outward symptoms such as difficulty speaking and pronouncing words, body tremors, and shallow breathing.

37.     The CIS security personnel, including the now present supervisor, ignored these obvious panic attack symptoms Ms. Grasso was displaying, and continued interrogating and berating her about her service animal, and preventing her from entering the building.

38.     Ms. Grasso knew she needed medical assistance.  RRB nursing staff was called to assist her only after she demanded it.  Eventually, an amulance was called for Ms. Grasso.

39.     Approximately eight CIS security employees ultimately became involved in this incident. Ms. Grasso could overhear them discussing what to do with people with disabilities and service animals while she was in the midst of a dangerous panic attack, .  As such, it was quite evident they had sorely inadequate training on this procedure, if any at all.  Yet again, Ms. Grasso was treated as a test subject for uninformed and untrained CIS security employees.  In addition, Ms. Grasso heard the CIS security officers laughing while she struggled to breath.

40.     After approximately an hour of working with the on-site nurse, Ms. Grasso was able to walk again.  Her heart rate, though still high, started to steady and she was permitted to enter the USAID facility with her service animal off leash and controlled by strict verbal commands.  If the CIS security officers had simply allowed Ms. Grasso to so enter the facility when she first returned from lunch, this entire unfortunate incident would have been avoided.

41.     There was no legitimate reason for CIS security personnel to have stopped Ms. Grasso in the first place, let alone berated her and prevented her from entering the USAID facility.  Their conduct directly caused Ms. Grasso to suffer a panic attack, which hindered her ability to perform professionally, necessitated medical treatment, and caused her emotional and physical injury.

42.     The CIS officers' actions toward Ms. Grasso on both occasions were extreme and outrageous, intentional and/or reckless, and caused Ms. Grasso severe emotional suffering.

43.     The CIS personnel intentionally and repeatedly subjected Ms. Grasso to unconsented, unlawful, and offensive bodily contact.

44. The CIS personnel intentionally and repeatedly subjected Ms. Grasso to unlawful attempts and/or threats, by words and/or acts, to subject Ms. Grasso to unconsented, unlawful, and offensive bodily contact.

45. Due to her diagnosed PTSD, which entails vulnerability to severe panic attacks, Ms. Grasso is especially susceptible to injury resulting form such conduct.

46. Moreover, the fact that Ms. Grasso arrived at both facilities, on the occasions at issue and multiple times previously, with a service dog who was clearly designated as such by the wearing of a marked vest, repeatedly requested the assistance of her service dog, and had been to each facility numerous previous times with her service dog, put the CIS personnel involved on notice of Ms. Grasso's particular susceptibility to such injury.

47. All actions alleged herein by CIS personnel were committed within the scope of their employment with defendant CIS.

48. The defendant's tortious conduct was outrageous, characterized by malice, wantonness, gross fraud, recklessness, or willful disregard of the plaintiff's rights.

## Statement of Claims

### Count I - Intentional Infliction of Emotional Distress

48. CIS employees and/or agents subjected Ms. Grasso to intentional infliction of emotional distress, as their actions toward her were extreme and outrageous, intentional or reckless, and caused Ms. Grasso severe emotional suffering.

### Count II - Battery

49. CIS employees and/or agents subjected Ms. Grasso to multiple batteries, as they intentionally and repeatedly subjected Ms. Grasso to unconsented and offensive bodily contact.

**Count III - Assault**

50.     CIS employees and/or agents subjected Ms. Grasso to multiple assaults, as they intentionally and repeatedly subjected Ms. Grasso to unlawful attempts and/or threats, by words and/or acts, to subject Ms. Grasso to unconsented and offensive bodily contact.

**Count IV - Rehabilitation Act**

51.     CIS employees and/or agents unlawfully excluded Ms. Grasso from access to the benefits of a federal building and discriminated against her under a program receiving federal financial assistance solely because of her disability in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

**Count V - Americans With Disabilities Act**

52.     CIS employees and/or agents unlawfully discriminated against Ms. Grasso on the basis of disability by denying her the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12182.

53.     CIS is liable for the actions of its employees and/or agents described herein under the doctrine of *respondeat superior*, as all actions were taken in the scope of their employment with CIS.

54.     As a direct and proximate result of these tortious, discriminatory, and unlawful acts committed by CIS against Ms. Grasso, Ms. Grasso has suffered and continues to suffer injuries in the form of severe emotional distresses, physical pain and suffering, fear, anxiety, loss of enjoyment of life, exacerbated PTSD symptoms, personal and professional humiliation and embarrassment, interference with professional opportunities, as well as other emotional distress and pain and suffering.

### Prayer for Relief

WHEREFORE, plaintiff prays that this Court enter judgment in her favor and against defendant on the claims of intentional infliction of emotional distress, assault, and battery, and provide her with the following relief:

(a)     award plaintiff compensatory damages against defendant in the amount of $500,000.00, plus interest thereon;

(b)     award plaintiff punitive damages against defendant in the amount of $500,000.00, plus interest thereon

(c)     enjoin defendant and its employees and agents from harassing plaintiff in the future at the GAO facility, or any other facility where CIS contractor personnel are employed as security personnel;

(d)     award plaintiff reasonable attorneys' fees and costs associated with bringing and maintaining this civil action pursuant to 42 U.S. Code § 12205 and 29 U.S.C. § 794a; and

(e)     award plaintiff such other and further relief as the interests of justice may require.

### Jury Demand

Plaintiff hereby requests a trial by jury on all issues of fact, including the measure of damages.

Respectfully submitted,

David H. Shapiro / D.C. Bar No. 961326
J. Cathryne Watson / D.C. Bar No.1032640
SWICK & SHAPIRO, P.C.
1101 15th Street, N.W., Suite 205
Washington, DC 20005
Tel (202) 842-0300 / Fax (202) 842-1418
Email - dhshapiro@swickandshapiro.com
        jcwatson@swickandshapiro.com
Attorneys for Plaintiff